**JOHNSON'S ISLAND PROPERTY OWNERS' ASSOCIATION et al., Appellants and Cross–Appellees,**

**v.**

**SCHREGARDUS, Director, et al., Appellees;**

**Baycliff's Corporation, Appellee and Cross–Appellant.**

[Cite as *Johnson's Island Property Owners' Assn.*
*v. Schregardus* (1995), 104 Ohio App.3d 563.]

Nos. 94APH10–1441, 94APH10–1442, 94APH10–1443, 94APH10–1444, 94APH10–1445, 94APH10–1446, 94APH10–1472, 94APH10–1473, 94APH10–1474, 94APH10–1475, 94APH10–1476 and 94APH10–1477.

Court of Appeals of Ohio,
Tenth District, Franklin County.

Decided June 15, 1995.

564

*Samuels & Northrop Co., L.P.A.,* and *Stephen P. Samuels,* for appellants and cross-appellees Johnson's Island Property Owners' Association et al.

*McTigue & Brooks* and *Donald J. McTigue,* for appellee and cross-appellant Baycliff's Corporation.

*Betty D. Montgomery,* Attorney General, *James O. Payne, Jr.,* and *John K. McManus,* Assistant Attorneys General, for appellee Donald Schregardus, Director of Environmental Protection.

DESHLER, Judge.

This is an appeal by appellants, Johnson's Island Property Owners' Association and the individual trustees of the Johnson's Island Property Owners' Association, from an order of the Environmental Board of Review ("EBR"), affirming the decision of the director of the Environmental Protection Agency ("EPA") to grant three water quality certifications to Baycliff's Corporation ("Baycliff's"). Baycliff's has filed a cross-appeal from the order of the EBR.

This action arose out of a proposal by Baycliff's proposal to construct a commercial marina on Johnson's Island, a small island located in Sandusky Bay, Ottawa County, Ohio. The appellants are members of a nonprofit association, composed of residents of Johnson's Island.

In November 1990, Baycliff's submitted an application for a permit with the United States Army Corps of Engineers pursuant to Section 404 of the Federal Pollution Control Water Act, Section 1344, Title 33, U.S.Code. The application sought authorization for the following activities: construction of boat docks,

dredging and placement of fill relating to improvements of a bridge and for shore protection, and dredging necessary to install a force main sanitary sewer from the island to the mainland.

As a prerequisite to obtaining a Section 404 permit, Baycliff's sought state certification that the project would comply with water quality standards pursuant to Section 401 of the Clean Water Act, Section 1341, Title 33, U.S.Code. On March 20, 1992, the director of EPA issued three water quality certifications to Baycliff's.

On April 17, 1992, appellants appealed the issuance of the certifications to the EBR, contending that the proposed project would result in violations of the state's water quality standards. Specifically, appellants asserted that the operation of a marina and the proposed dredging and filling of material in the waters and submerged lands adjacent to the island would violate provisions of Ohio Adm.Code 3745–1–04 and 3745–1–05.

In September 1993, the EBR conducted a *de novo* hearing on the matter. The EBR issued a decision on September 7, 1994, affirming the decision of the director to issue water quality certifications to Baycliffs. The EBR also denied a motion by Baycliff's to dismiss the appeal.

On appeal, appellants set forth two assignments of error for review:

"First Assignment of Error:

"The Environmental Board of Review erred as a matter of law in holding that a nonapplicant appellant challenging the issuance of a permit has the burden of going forward with the evidence at a de novo hearing before the Environmental Board of Review.

"Second Assignment of Error:

"The Environmental Board of Review erred in concluding that the evidentiary record contained a valid factual foundation that the activities authorized by 401 water quality certifications would not result in a violation of water quality standards."

Baycliff's has filed a cross-appeal, setting forth the following assignment of error:

"Assignment of Error No. 1.

"The Environmental Board of Review erred in failing to grant Baycliff's Corporation's motion to dismiss."

Under the first assignment of error, appellants contend that the EBR erred as a matter of law in holding that a nonapplicant challenging the issuance of a

permit has the burden of going forward with evidence at a *de novo* hearing before the EBR.

At the outset of the hearing before the EBR, counsel for appellants argued that, based upon this court's decision in *Jackson Cty. Environmental Commt. v. Shank* (Dec. 10, 1991), Franklin App. Nos. 91AP-57 and 91AP-58, unreported, 1991 WL 268325, the applicant for a permit in a *de novo* proceeding before the EBR (*i.e.,* in the instant case Baycliff's) had the burden of proceeding first with its evidence.

In response, counsel for the director of EPA argued that the applicable statutes, rules, and case law empowered the EBR to make decisions regarding how to conduct its proceedings, including the order of evidence; counsel further contended that, in the present case, appellants should be required to proceed first in the interests of judicial economy. Counsel for Baycliff's also urged the EBR to require appellants to proceed first, although acknowledging that the burden of proof would remain with the applicant.

After a brief recess, during which the members of the EBR considered the arguments of counsel, the chairwoman of the EBR indicated that the EBR did "not agree that the burden of proceeding is necessarily always to be placed upon the applicant." The chairwoman stated that, in the interests of judicial economy, the EBR would require appellants to proceed first. Counsel for appellants then indicated that appellants would not present any evidence; more specifically, counsel stated, "I think it [the EBR's ruling] is in error and I decline to proceed at this time."

On appeal, appellants contend that the EBR erred in placing the burden of going forward with evidence on appellants and that the error was prejudicial and constituted a violation of due process rights. In support, appellants rely upon this court's decision in *Jackson Cty., supra.*

In *Jackson Cty.*, this court addressed the issue whether the burden of going forward with evidence is upon a nonapplicant at a *de novo* hearing before the EBR where there had been no adjudication hearing by the director. This court held:

"As a technical matter, since the hearing is *de novo,* the same as if no prior decision had been made, and since, in effect, it is the initial original adjudication hearing, the burden necessarily is upon the applicant, not only with respect to proof but, also, with respect to going forward with the evidence. This places the burden upon the applicant to demonstrate that the decision of the director is both reasonable and lawful." *Id.* at 8.

Notwithstanding arguments to the contrary by appellees Baycliff's and the director of EPA, we find that the language of *Jackson Cty.* makes clear, and

supports appellants' contention, that the burden of going forward with evidence (as well the burden of proof) is upon the applicant. We are cognizant that the court in *Jackson Cty.* noted, "We have in some cases indicated that it is not inappropriate for the EBR to require the appellant (even if not the applicant) to proceed first with the evidence, that is to place a burden of going forward with the evidence upon the appellant, whether or not the applicant." *Id.* at 7. However, we do not find that this language is directed to the issue of which party properly bears the burden of going forward with the evidence; rather, read in context with the rest of the opinion, it indicates only that the manner in which the EBR directs the presentation of evidence will not be reversed absent a showing of prejudice.

 Accordingly, although we conclude that the EBR erred in requiring appellants to proceed first with evidence at the *de novo* hearing, we must further consider whether the error was prejudicial. Initially, we note that, while the EBR ruled that appellants would have the burden of proceeding first with the evidence at the hearing, the record is clear that the EBR did not require appellants, as nonapplicants, to establish a prima facie case.

Further, when the issue arose regarding which side would be required to proceed first with evidence, the EBR indicated that, in the event appellants declined to go forward, the EBR would interpret appellants' action as "waiving its right to present its case." However, the EBR made it clear that appellants would be permitted to cross-examine appellees' witnesses and to proffer any evidence, including the presentation of witnesses. The record indicates the following exchange between the chairwoman of the EBR and counsel for appellants and the EPA:

"MR. SAMUELS [Counsel for appellants]: * * * I take it from the board's ruling that it is going to forbid me from presenting my case in chief at what I consider to be the appropriate time. I wish to know whether I can be allowed to proffer that testimony.

"CHAIRWOMAN BULL: You will be allowed to proffer.

" * * *

"MR. PAYNE [Counsel for the director of EPA]: May I make a comment, an observation? I don't understand the board's ruling to say that the appellant must go forward with evidence in the sense of a—of a burden of going forward.

"I understand it to be a ruling that the appellant must go first with whatever evidence it intends to present in the case, but the board's clarification is that— that there is not a burden to set forth a certain amount of evidence.

"If I understood the board's ruling correctly.

"CHAIRWOMAN BULL: Yeah, I think that is all we were saying.

" * * *

"MR. PAYNE: One additional observation: The director would not object if the proffer were done by the actual presentation of live witnesses just to make things easier if there is an appeal * * *.

"So for purposes of preserving the record for appeal, the director does not have an objection if the appellant wants to present the live witnesses as part of a proffer.

"CHAIRWOMAN BULL: Okay. * * *"

Counsel for appellants, in addition to stating that appellants would not proceed first with evidence, also indicated that no proffer would be forthcoming. Specifically, counsel stated, "We do not intend to put on any evidence because you indicated you would consider it [*sic*, 'not consider'?], but we would like to do it. We are not going to proffer anything; we are not going to call any witnesses."

Based upon the state of the record in the instant case, appellants' contention that the ruling of the EBR rises to the level of a due process violation is unpersuasive. While we have indicated that the EBR erred in allocating to appellants the burden of proceeding, the EBR's ruling did not, standing alone, preclude appellants from putting on evidence. Rather, while the ruling altered the order in which the evidence should have been presented, appellants were nonetheless afforded the opportunity, which they declined, to proceed with their evidence. We note that there is no indication from the record that any of appellants' witnesses were unavailable to testify when the hearing began. Although we disapprove of the EBR's practice, we decline to hold that error by the EBR in allocating the burden of going forward with evidence constitutes prejudicial error *per se*. See *Jackson Cty., supra*, at 11 ("in the ordinary case there may be no prejudicial error resulting from the placing of the burden of going forward with the evidence upon a nonapplicant appellant before the EBR").

Moreover, appellants were afforded the opportunity, by means of a proffer, to make a record for appeal which might indicate prejudice from the EBR's ruling. However, while the EBR made it clear that appellants would be allowed to proffer evidence, including testimony by witnesses at the hearing, appellants declined to make such a record. In the absence of a proffer, this court is unable to determine what evidence (if any) appellants were prepared to present to challenge or refute testimony presented by appellees' expert witnesses that the proposed project would not violate water quality standards.[1] Further, we again

---

1. R.C. 3745.05 provides that, during a hearing before the EBR, "if the board refuses to admit evidence the party offering same may make a proffer thereof, and such proffer shall be made a part of the record of such hearing."

note that the record indicates that the EBR permitted appellants the full opportunity to cross-examine each of appellees' witnesses. More significantly, the record in this case does not indicate that the EBR erroneously shifted the burden of proof from the applicant to the appellants in this case.

In light of the above, we are unable to conclude that appellants have shown prejudicial error by the EBR's ruling. Appellants' first assignment of error is therefore overruled.

Under the second assignment of error, appellants contend that the EBR erred in concluding that the record contained sufficient evidence that the activities authorized by the certifications would not result in a violation of water quality standards.

Pursuant to R.C. 3745.05, if no adjudication hearing has been conducted by the director of the EPA, the EBR "shall conduct a hearing de novo on the appeal." The statute further provides:

"If, upon completion of the hearing, the board finds that the action appealed from was lawful and reasonable, it shall make a written order affirming the action[;] if the board finds that the action was unreasonable or unlawful, it shall make a written order vacating or modifying the action appealed from."

█ This court has previously held that, on an appeal of a decision of the director of EPA to the EBR, where the evidence demonstrates that the action taken by the director is reasonable and lawful, the EBR must affirm the director; the EBR "initially does not stand in the place of the Director upon appeal, and is not entitled to substitute its judgment for that of the Director, but is limited to a determination of whether the action taken by the Director is unreasonable or unlawful." *Citizens Commt. v. Williams* (1977), 56 Ohio App.2d 61, 69, 10 O.O.3d 91, 96, 381 N.E.2d 661, 666.

R.C. 3745.06 addresses appeals to a court of appeals from an order of the EBR, and provides in part that:

"The court shall affirm the order complained of in the appeal if it finds, upon consideration of the entire record and such additional evidence as the court has admitted, that the order is supported by reliable, probative, and substantial evidence and is in accordance with law."

Ohio Adm.Code 3745–32–05 sets forth the following criteria which the director of the EPA is to consider in determining whether a Section 401 certification should be issued:

"(A) The director shall not issue a section 401 water quality certification unless he determines that the applicant has demonstrated that the discharge of dredged

or fill material to waters of the state or the creation of any obstruction or alteration in waters of the state will:

"(1) Not prevent or interfere with the attainment or maintenance of applicable water quality standards;

"(2) Not result in a violation of any applicable provision of the following sections of the Federal Water Pollution Control Act including:

"(a) Effluent limitations as described in section 301;

"(b) Water quality related effluent limitations as described in section 302;

"(c) Water quality standards and implementation plans as described in section 303;

"(d) National standards of performance as described in section 306; or

"(e) Toxic and pretreatment effluent standards as described in section 307.

"(B) Notwithstanding an applicant's demonstration of the criteria in paragraph (A) of rule 3745-32-05 of the Administrative Code, the director may deny an application for a section 401 water quality certification if the director concludes that the discharge of dredged or fill material or obstructions or alterations in waters of the state will result in adverse long or short term impact on water quality.

"(C) The director may impose such terms and conditions as part of a section 401 water quality certification as are appropriate or necessary to ensure compliance with the applicable laws and to ensure adequate protection of water quality.

"(D) Prior to the issuance of a section 401 water quality certification or prior to, during, or after the discharge of dredged or fill material to waters of the state or the creation of any obstruction or alteration in waters of the state to ensure adequate protection of water quality, the director may require that the applicant perform various environmental quality tests including, but not limited to, chemical analyses of water, sediment or fill material, and bioassays."

In the present case, the director of EPA issued 401 certifications to Baycliff's subject to the following conditions:

"Fill used in this project shall consist of suitable material free from toxic contaminants in other than trace quantities.

"Extreme care must be employed throughout the course of this project to avoid the creation of unnecessary turbidity which may degrade water quality or adversely affect aquatic life outside of the project area.

"All dredged material shall be placed at an upland site in such a way that sediment runoff to the waterway is controlled and minimized."

Appellants assert that expert testimony presented by appellees indicating that the project would have minimal impact on water quality, was based upon "sheer speculation." Appellants argue that there is a complete absence of evidence regarding the existing water quality in the quarry, and that the applicant failed to present evidence as to the amount or kinds of pollutants that will be released into the water column as a result of the project.

In the present case, the EBR made findings that the agency had considered not only how the project might adversely affect water quality, but also the potential effects of the development once the construction was completed. The EBR noted that the project at issue contemplated construction of an inner dockage area, in an existing quarry on the island, and an outer dockage area, which opens into Sandusky Bay. The project plans included excavating a channel to connect the quarry with the outer dock area. The plans further proposed the construction of rubble-mound breakwater extensions of existing piers, the place-ment of riprap along the shoreline, including fish-spawning shelves, and the installation of floating docks.

At the hearing before the EBR, appellees introduced the trial deposition testimony of Colleen Crook, an environmental supervisor with the EPA's division of water quality. Crook, who supervises the agency's Section 401 program, testified regarding the EPA's review of applications by Baycliff's for Section 401 certification. Crook was involved in the review of the applications at issue.

The order of the EBR included findings that the EPA had considered, among other things, the volume of fill to be placed for the pier extensions, the nature of the material to be used for the fill, and the width of the opening of the channel into the dockage area. Crook testified that the EPA considered the potential impact on water quality in the outer dockage area as a result of narrowing the entrance from Sandusky Bay; the width of the opening was assessed to deter-mine whether adequate water flow would be made available from Sandusky Bay to maintain a quality oxygen level and to maintain water quality standards within the outer dockage area. Further, the agency considered the impact on water quality during construction, including increased levels of turbidity or increased suspended sediments in the water column. According to Crook, the EPA determined that "there would be adequate flow from Sandusky Bay into the outer dockage area as well as in the outer dockage area back to Sandusky Bay to maintain water quality standards within the outer dockage area."

The EBR made a finding that the EPA had reviewed the impact on water quality resulting from the proposed dredging activity. According to the testimo-ny of Crook, in reviewing the dredging plans, the EPA considered the quality of the dredged material, the accuracy of the dredging depths, the possible effects on groundwater resources and a consideration of increased level of suspended

sediments. Crook testified that the agency had determined that the applicant properly "minimized the amount of fill that was necessary to provide adequate protection to the outer dockage area." Further, the EPA determined that the fill to be used for the breakwater extensions and for the placement of riprap along the shoreline was clean. The EPA concluded that the effect on the water column would be short-term and that "the mechanical dredging would not violate water quality standards."

The EBR found that the EPA had conducted a review of test results to evaluate the impact that the material, after it was dredged and placed, might have on groundwater in the area. Crook testified that the applicant conducted sediment tests of the proposed dredging material and, based upon the results, upland disposal was determined to be proper. The EPA had required the applicant to test the sediments to determine whether any toxic or hazardous substances were present. The testing indicated that the sediments were free of such substances. Testing of the dredged material also indicated that the soil was silty clay.

The EBR made a finding that the agency had properly considered whether postconstruction activities would adversely affect water quality. Regarding the proposed floating docks, Crook testified that the EPA had considered the potential effects on water quality from oil and grease and fuel that might be discharged from boats moored at the docks. Further, the agency considered the effect on water quality resulting from boats moving in and out of the outer dockage area. This included a determination whether the channel would be deep enough to prevent the resuspension of sediments. Crook noted that if water depth was inadequate, and boat propellers were too close to the bottom of the dockage area, propeller action would resuspend sediments off the bottom of the water column, resulting in increased levels of turbidity. The EPA determined that, based upon the proposed depth (six feet below the low water datum), "prop wash or increased levels of turbidity was not an issue." Crook further indicated that the project contemplated the use of pump-out facilities; the agency considered whether there would be any leakage of waste resulting from these facilities. Based upon its review of this aspect of the project, the EPA determined that the installation of the floating docks would not violate water quality standards.

The EBR made a finding that the agency had further considered the effects of runoff, including runoff contributed by the proposed residential development. The EBR noted that the agency requested the applicant to employ restrictive covenants as a means to control runoff from non-point-source pollutants in the quarry. The evidence indicated that, in response to the EPA's concerns, Baycliff's proposed restrictive covenants in its residential deeds limiting the use of fertilizers and other activities that might adversely affect water quality. Restric-

tions were also placed on the discharge of oil or oil byproducts onto residential premises.

Dr. Charles E. Herdendorf, a professor emeritus of limnology and oceanography at the Ohio State University and a consultant to Baycliff's on the project, testified regarding the effect of runoff from the surrounding development area into the quarry. Based upon calculations regarding average amount of yearly rainfall, the size of the development area and the amount of lake water influence, Dr. Herdendorf opined that "the runoff is a perhaps two-percent constituent of the water and * * * the lake is continually coming in and flushing that out."

The EBR further made a finding that one of the postconstruction concerns of the EPA was whether the project would violate the applicable water quality standard for dissolved oxygen. The evidence adduced at the hearing indicated that the EPA required the applicant to develop a plan to maintain the level of dissolved oxygen within the quarry at six milligrams per liter based upon standards set forth under Ohio Adm.Code 3745-1-07. Dr. Herdendorf discussed the relationship between dissolved oxygen and water exchange, noting that dissolved oxygen is an important component for aquatic life and must be maintained at a level of above four to five parts per million for healthy fish life. As water becomes warmer, the oxygen can dissolve; further, certain amounts of sediment or organic debris in water can cause a demand for oxygen. Dr. Herdendorf noted that the natural exchange of waters between the bay and marina would result in daily replenishment of water, carrying new dissolved oxygen into the bay area. He further noted that dissolved oxygen can be artificially injected into the lake by means of aerators.

The evidence indicated that the project at issue involved the use of floating aerators within the quarry to maintain the required level of oxygen. During the hearing, Dr. Herdendorf identified a report compiling data from sediment and water samples taken from the proposed marina area. The report indicated no detection of organic compounds; the sediment levels were found to be "quite low and below any standard levels."

The EBR made findings that the EPA also considered the potential impact the project would have on the Lake Erie watersnake based upon concerns raised by the Department of Natural Resources. Crook testified that the applicant had conducted studies on the snake and submitted a proposal for measures to offset potential adverse effects on the snake. The Department of Natural Resources approved a snake mitigation plan and it was subsequently recommended that the Corps of Engineers adopt the plan as a special condition to the applicant's receiving a Section 404 permit. The permit, which was admitted as an exhibit, indicated that the applicant was required to construct a refuge for the Lake Erie watersnake as a special condition. The condition further required biannual

monitoring of the snake refuge population for a period of ten years after construction.

Dr. Herdendorf indicated that the project would actually result in a net increase in area for aquatic life. He stated that the project would allow species into areas that have previously not been available; he noted that Lake Erie is very deficient in protected coastal areas, and that the proposed protected spawning sites would "greatly enhance reproduction of aquatic species in the area."

Regarding the applications involving the proposed bridge revision and installation of a force main sewer, the EBR found that the agency properly concluded that the material to be used was clean, that the water quality effects of construction would be temporary, and that testing indicated that groundwater would not be adversely affected and that turbidity would be minimized.

In addition to the testimony presented, numerous exhibits were admitted at the hearing, including laboratory results of water and dredge samples, grain size distribution test results, hydrology assessment reports, copies of the proposed restrictive covenants, aeration plans and information, a water well assessment report and a report on water circulation and dissolved oxygen within the project area. The EBR, upon review of the data and consideration of the expert testimony presented, concluded that the director's decision that the proposed project would not prevent or interfere with applicable water quality standard was both reasonable and lawful. The EBR found that there was substantial evidence that the EPA had gone to considerable lengths in its review of the application, including the employment of six divisions of the agency and two divisions of the Ohio Department of Natural Resources; further, the EBR found that the evidence indicated that, throughout the application process, Baycliff's had responded to concerns raised by the EPA, resulting in the design of a project that would comply with applicable environmental laws and regulations.

■ The basic issue raised by appellants is whether the findings of the EBR are supported by reliable, substantial and probative evidence. Based upon a review of the record, we find that the EBR's findings are supported by reliable, probative and substantial evidence.

Appellants contend that the EPA did not have sufficient evidence to support its decision because it failed to conduct an on-site inspection of the island. Initially, we note that appellants do not cite any statute or regulation requiring the agency to conduct an on-site evaluation whenever a Section 401 certification application is made; nor do appellants make a persuasive argument that an on-site visit would always be necessary or practical. The record indicates that the permit application of Baycliff's included detailed maps and engineering drawings regarding the

site. Appellants have failed to show how the absence of an on-site visit by the agency prevented it from making a reasoned decision regarding the certifications.

Appellants further argue that the agency did not have enough information regarding the existing water quality in the quarry or bay. We are unpersuaded. We have previously noted evidence before the EBR supporting the determination that the project would not violate water quality standards, including test results of water and sediments taken from the quarry area, the proposed use of aerators to improve and maintain levels of oxygen, the EPA's consideration of the depth of the water, and proposed deed restrictions to limit runoff. Again, based upon the evidence presented, the findings of the EBR were not contrary to the reliable, probative and substantial evidence in the record.

Finally, appellants contend that there is no evidence regarding the amount or kind of pollutants that will be released into the water column as a result of the dredging of the material. We find this argument to be without merit. The record indicates that the EBR considered testimony by appellees' witnesses indicating that the dredging activity would have only a short-term impact on the area. Furthermore, Ohio Adm.Code 3745–1–01(F)(2) provides an exception to water-quality standards regarding dredging or construction activities "during the period of time when the aftereffects of dredging or construction activities degrade water quality and such activities have been authorized by the United States army corps of engineers and/or 401 water quality certification by the Ohio environmental protection agency."

In sum, upon review of the entire record, we conclude that the order of the EBR affirming the decision of the director to grant three Section 401 water quality certifications to Baycliff's is supported by reliable, probative and substantial evidence and is in accordance with law.

Based upon the foregoing, appellants' second assignment of error is without merit and is overruled.

Baycliff's has filed a cross-appeal, asserting that the EBR erred in failing to grant its motion to dismiss appellants' appeal. Because we have overruled appellants' assignments of error, the issue raised by Baycliff's in its cross-appeal is rendered moot.

Accordingly, appellants first and second assignments of error are overruled, the cross-assignment of error of Baycliff's is rendered moot, and the order of the EBR is hereby affirmed.

*Order affirmed.*

PEGGY BRYANT and CLOSE, JJ., concur.

CLOSE, Judge, concurring.

As plainly as we can, we must tell EBR that, in a *de novo* proceeding, the applicant has the burden of going forward with the evidence. That means that, except in exceptional circumstances, the applicant goes first. To do otherwise jeopardizes the process and makes very real the probability of retrying cases at great expense to citizens and agencies of Ohio.