BUCKEYE POWER, INC. et al., Appellants,

v.

KORLESKI, Dir., Appellee.

[Cite as *Buckeye Power, Inc. v. Korleski,* 183 Ohio App.3d 179, 2009-Ohio-2232.]

Court of Appeals of Ohio,
Tenth District, Franklin County.

No. 08AP–850.

Decided May 12, 2009.

180

Shumaker, Loop & Kendrick, L.L.P., Louis E. Tosi, Michael E. Born, Katie L. Tournoux, and Cheri A. Budzynski, for appellants.

Richard Cordray, Attorney General, and John F. Cayton and Sari L. Mandel, Assistant Attorneys General, for appellee.

TYACK, Judge.

{¶ 1} Appellants, Buckeye Power, Inc., Columbus Southern Power Company and Ohio Power Company d.b.a. American Electric Power, the Dayton Power and Light Company, Duke Energy Ohio, Inc., and Ohio Valley Electric Corporation, are a consortium of Ohio electric utilities (collectively, the "utilities"). The utilities challenged revised Ohio Environmental Protection Agency ("OEPA") rules governing disposal of residual solid waste ("RSW") and, in particular, coal-combustion waste produced by a flue-gas desulferization system or "scrubber." The utilities appeal from a final order of the Environmental Review Appeals Commission ("ERAC") dated August 27, 2008, affirming promulgation of revised RSW rules by appellee, Chris Korleski, the Ohio director of environmental protection. Specifically, the utilities challenged whether the RSW siting criteria in Ohio Adm.Code 3745–30–06(H)(2)(d) and (H)(4)(d) were reasonable and lawful, and ERAC determined that they were.

{¶ 2} The OEPA has promulgated siting criteria for the placement of the RSW landfills at issue in this case. There are two specific siting requirements that are the subject of this appeal. First, "[t]he residual solid waste landfill facility is not located above an unconsolidated aquifer system capable of sustaining a yield of one hundred gpm [gallons per minute] for a twenty-four-hour period to an existing or future water supply well located within one thousand feet of the limits of residual solid waste placement." Ohio Adm.Code 3745–30–06(H)(2)(d). Second, "[t]he limits of solid waste placement are not located within two hundred feet

of areas determined by Ohio EPA or the United States army corps of engineers to be a stream, lake, or wetland." Ohio Adm.Code 3745–30–06(H)(4)(d). A prior version of the rules had nearly identical prohibitions but contained an escape clause that read "unless deemed acceptable by the director." Former Ohio Adm.Code 3745–27(B)(9) and (B)(14) (effective March 1, 1990). This additional language allowed an applicant to apply for a permit to install even if it did not meet all of the siting criteria.

{¶ 3} The OEPA revisited and subsequently revised its siting rules on August 4, 2003, in accordance with R.C. 119.032. That statute requires all state agencies to conduct periodic reviews to determine whether the rules needed to be revised, left unchanged, or rescinded. OEPA's new rules eliminated the "unless deemed acceptable" language from the siting criteria at issue here. The parties agreed that the OEPA correctly followed administrative procedure in the rulemaking process. The utilities participated extensively during the rules-review process.

{¶ 4} The effective date of the new rules was August 15, 2003, and the utilities timely appealed from the director's final promulgation. The issue before ERAC was whether the new rules unreasonably and unlawfully applied siting criteria to RSW disposal facilities without a factual or technical basis for the application. ERAC conducted a de novo hearing on December 12 through 15, 2005, and it is from ERAC's August 27, 2008 findings of fact, conclusions of law, and final order ("Order") that this appeal is taken.

{¶ 5} The following facts are germane to our discussion. In 1976, the OEPA set forth siting criteria for solid-waste landfills in order to protect Ohio's critical surface-water and ground-water resources. The early rules contained a procedure from which one could be granted a waiver from one or more of the siting criteria if the owner or operator could demonstrate that the facility would not cause water pollution, not create a nuisance or health hazard, and would not result in a violation under R.C. Chapter 3704.

{¶ 6} Over the years, the OEPA made the solid-waste rules more stringent. During the rulemaking procedure that resulted in the 1990 revisions, the utilities expressed a desire for coal-combustion solid waste to receive more lenient requirements than other types of solid waste due to the relatively innocuous nature of the waste the utilities produced.

{¶ 7} In 1992, the OEPA promulgated RSW rules codified at Ohio Adm.Code 3745–30–06 for low-toxicity, high-volume waste. Of the rules governing siting criteria, seven of the 15 siting criteria contained "unless deemed acceptable by the director" language enabling a waste facility to obtain a permit even if it did not meet all the siting criteria. In order to do so, the facility had to submit a proposal and justification as to why it was acceptable to receive a permit even

though it did not meet all the siting criteria. The decision to approve such a proposal was discretionary with the director and not subject to review.

{¶ 8} In addition to a request that the director deem an application acceptable, the rules contained a formal procedure by which an applicant could request a variance or an exemption from the siting criteria. The OEPA distinguishes between variances and exemptions in the following way: an applicant seeking to vary the requirements of a rule, such as asking for a 100–foot setback instead of a 200–foot setback, should apply for a variance; an applicant seeking to be exempt from a requirement, such as siting a landfill over an aquifer of 100 gpm or more, must apply for an exemption. Thus, if an applicant wants to vary from the provisions of the rule, an application for a variance is the proper mechanism. If an applicant wants to be completely relieved from complying with a particular rule, the applicant should seek an exemption. In using this procedure, ERAC has taken the position that an interested party may appeal from acceptance or denial of a variance but that inaction or denial of an exemption is not reviewable.[1] At the hearing before ERAC, the OEPA presented evidence that its analysis under the "unless deemed acceptable" language was the same as its analysis for a variance.

{¶ 9} On March 10, 2005, the United States Environmental Protection Agency finalized interstate clean-air rules requiring the reduction of sulfur dioxide and nitrogen oxide emissions. To achieve compliance with the clean-air standards, the utilities determined that they needed to install additional scrubbers on their plants, which, in turn, would result in a significant increase in the quantity of scrubber sludge being produced. However, not all scrubber sludge disappears into landfills. There are some beneficial uses for scrubber sludge. For example, scrubber sludge is used in mine reclamation, wall board, feed lots for cattle, and road base. Nevertheless, excess scrubber sludge must be interred in an RSW landfill, and the utilities recognized the need for additional landfill space. The utilities expressed an interest in siting some of these landfills on the same grounds as the coal-burning power plants.

{¶ 10} At the de novo hearing, the utilities' expert witness offered an opinion on the following question: "Is there any scientific or technical basis for prohibiting FGD [flue gas desulphurization] residual waste, Class III residual waste landfills from being sited over 100 gallon per minute aquifers or within 200 feet of streams?" Order, at ¶ 94. The expert concluded that "[b]ased on standard landfill design, the predicted modeled concentration of leached Class III residual waste constituents that has the potential to enter an underlying aquifer or

---

1. The issue of whether a denial of an exemption request is reviewable has yet to be decided by this court.

adjacent river or stream is lower than drinking water and surface water quality standards." Id. at ¶ 110. The utilities' witnesses also testified that there were certain ecological advantages to locating an RSW landfill close to a coal-burning plant. However, under the current siting rules it would be difficult, if not impossible, to locate an RSW facility close to a coal-burning power plant because those plants require large amounts of water to operate, and most are located near significant sources of water, including rivers, streams, and large aquifers.

{¶ 11} The OEPA presented no expert scientific testimony of its own. However, ERAC found a reasonable basis for the siting criteria based upon the considerable deference to be afforded to an agency's interpretation of its statutory authority, public comments that were part of the record, OEPA witnesses who testified how the siting requirements fit in with the agency's broad overall strategy, a draft scoping report generated by the Siting Criteria Workgroup, and a 1986 draft strategy document outlining the state's plan for seeking to provide more stringent siting to protect its ground-water resources. ERAC found that according to a 1998 study by the OEPA, some fully lined solid-waste facilities have failed. The OEPA found this to be relevant to the rule that generally prohibits siting a facility over an unconsolidated 100 gpm aquifer.

{¶ 12} ERAC issued extensive findings of fact and conclusions of law. ERAC determined that the challenged restrictions were reasonable and necessary in keeping with the overall strategy for protecting Ohio's ground-water and surface-water resources. ERAC further concluded that the director had an adequate basis for removing the phrase "unless deemed acceptable by the director."

{¶ 13} The utilities appealed ERAC's final order assigning as error the following:

1. The ERAC erred as a matter of fact because the record indicates that Ohio EPA had no reliable, probative, or substantial evidence to demonstrate that the siting criteria were necessary given the engineering controls required by the residual solid waste rules and the innocuous nature of the waste.

2. The ERAC erred as a matter of law because the director's removal of the "unless deemed acceptable" language deprives the utilities of the procedural safeguard of reviewability of the director's failure to act on or his denial of an exemption.

3. The ERAC erred as a matter of law because R.C. 119.032 permits a party to appeal an agency's rule each time Ohio EPA repromulgates a rule under notice and comment rulemaking regardless of whether that party previously challenged the rule.

4. The ERAC erred as a matter of fact because the record indicates that the director failed to provide an adequate explanation for removing the "unless deemed acceptable" language from the siting criteria.

5. The ERAC erred when it allowed the director to exceed its statutory authority because the General Assembly did not grant the director the authority to prohibit siting locations under R.C. 3734.02(A) to ensure a sanitary facility that will be protective of human health and the environment.

{¶ 14} At the de novo hearing before ERAC, the utilities bore the burden of proof to demonstrate that there was no factual and legal basis upon which the director could promulgate the rules as he did. *Johnson's Island Property Owners' Assn. v. Schregardus* (1995), 104 Ohio App.3d 563, 568, 662 N.E.2d 878. Commissions such as ERAC were created "to facilitate certain areas of the law by placing the administration of those areas before boards or commissions composed of individuals who possess special expertise." *Harmony Environmental Ltd. v. Morrow Cty. Dist. Bd. of Health,* 10th Dist. No. 04AP–1338, 2005-Ohio-3146, 2005 WL 1483998, ¶ 8.

> "It is only where the board can properly find from the evidence that there is no valid factual foundation for the Director's action that such action can be found to be unreasonable. Accordingly, the ultimate factual issue to be determined by the board upon the *de novo* hearing is whether there is a valid factual foundation for the Director's action and not whether the Director's action is the best or most appropriate action, nor whether the board would have taken the same action."

*CLUB 3000 v. Jones,* 10th Dist. No. 07AP–593, 2008-Ohio-5058, 2008 WL 4416663, ¶ 28, quoting *Citizens Commt. v. Williams* (1977), 56 Ohio App.2d 61, 70, 10 O.O.3d 91, 381 N.E.2d 661.

{¶ 15} Where the evidence demonstrates that it is reasonably debatable as to whether the director should have promulgated the rules as he did, ERAC's duty is to affirm the director, rather than merely to substitute its judgment for his. Id. at 69–70, 10 O.O.3d 91, 381 N.E.2d 661.

{¶ 16} Pursuant to R.C. 3745.06, this court is to affirm the order of ERAC if we find that "upon consideration of the entire record and such additional evidence as the court has admitted, that the order is supported by reliable, probative, and substantial evidence and is in accordance with law." In the absence of such a finding, the court "shall reverse, vacate or modify the order or make such other ruling as is supported by reliable, probative, and substantial evidence and is in accordance with law." Id. As a reviewing court, we are to accord considerable deference to an agency's interpretation of rules and regulations. *Harmony,* 2005-Ohio-3146, 2005 WL 1483998, at ¶ 8; *Textileather Corp. v. Korleski,* 10th Dist. No. 06AP–955, 2007-Ohio-4129, 2007 WL 2306968, ¶ 54 ("Unless the agency's interpretation is unreasonable or conflicts with a statute covering the same subject matter, courts should follow that interpretation").

{¶ 17} With these standards in mind, we turn to the utilities' assignments of error. In their first assignment of error, the utilities attack the factual basis for the siting rules at issue. The utilities contend that they presented valid expert testimony that RSW is an innocuous substance that presents no threat to human health or the environment given the present-day advancements in siting design and engineering. The utilities further argue that the EPA's evidence on the necessity for the siting rules should not be given any weight, because its witnesses failed to rebut the utilities' evidence and their testimony was speculative.

{¶ 18} ERAC acknowledged the credibility of the expert witness testimony in the following way:

> At the outset, the Commission acknowledges that Mr. Hagen presented significant evidence to establish the relatively innocuous nature of coal combustion solid waste, the rigorous regulatory design components for RSW landfills, and the comparatively low risk to ground and surface waters associated with any unintended discharge from such a facility. Additionally, [other witnesses] offered persuasive testimony on behalf of the Utilities regarding the advantages to locating RSW landfills in close proximity to power plants.

Order, at ¶ 37.

{¶ 19} ERAC did not, however, find the EPA's evidence to be speculative. ERAC found that those particular siting criteria had been in effect since 1992 with only technical amendment and without substantive amendment, and it believed that "this conclusion dictates against a finding that the Director's action was unreasonable." Id. at ¶ 35.

{¶ 20} ERAC took note of comments made during the rule-amendment process from individuals and organizations who wanted to strengthen the siting criteria by making them absolute prohibitions. ERAC stated:

> Ohio EPA must review these comments in the broad perspective and in balance with the Agency's many statutory obligations ranging from ORC 119.032 to establishing rules that are protective of human health and the environment.

(Emphasis sic.) Order, at ¶ 38.

{¶ 21} The implication in the order is that the OEPA has an overall mission to protect human health and the environment and that in crafting their rules, it should not rubberstamp either the utilities' desires or those of certain environmentalists but, rather, to the best of its ability, consider all positions in light of its overall responsibilities.

{¶ 22} ERAC also credited the testimony of OEPA officials who set forth the agency position on locating landfills. The policy is first to ensure that the landfill is located in a geologically sound location and then to enhance the geological

protections with sound engineering. The OEPA is not in favor of placing landfills in a site that is vulnerable to ground-water contamination and then re-engineering the site to provide protection. ERAC concluded that the two siting criteria at issue are consistent with OEPA's overall strategy of protecting ground-water and surface-water resources.

{¶ 23} ERAC further relied on a draft scoping report generated by the Siting Criteria Workgroup of the OEPA to conclude that the agency had conducted a thorough review and approached the amendment in a thoughtful and comprehensive manner. Finally, ERAC credited a draft "Ohio Groundwater Protection and Management Strategy" dated October 1986. ERAC acknowledged that the document was a draft strategy composed over 20 years ago but nevertheless determined that the strategy continues to be used for guidance by the OEPA and provided a tangible factual foundation for the siting criterion regarding the 100 gpm aquifer.

{¶ 24} In weighing the evidence, ERAC acknowledged the scientific evidence presented by the utilities but ultimately decided to defer to the OEPA's interpretation of the regulations. In determining that OEPA's siting criteria were protective of human health and the environment, ERAC found the siting criteria lawful. In crediting OEPA testimony that appropriate siting with additional engineering protections was favored over using engineering to overcome poor siting, ERAC found a factual basis for deeming the siting criteria to be reasonable. In addition, the availability of variances and exemptions provided the necessary flexibility to address siting concerns throughout Ohio's diverse geological make-up.

■ {¶ 25} On appeal, we are loath to substitute our judgment regarding the credibility and persuasiveness of the evidence for that of the trier of fact. Our inquiry is limited to consideration of whether reliable, probative, and substantial evidence exists to support ERAC's final order. Based on our review of the transcript and evidence, we conclude that ERAC furnished an adequate basis for finding the criteria lawful and reasonable. The first assignment of error is overruled.

■ {¶ 26} In the second assignment of error, the utilities argue that the director's removal of the "unless deemed acceptable" language deprives them of the procedural safeguard of reviewability when the director refuses to act or denies an exemption. OEPA, however, contends that the removal of the language did not change the review process or the likelihood of a deviation from the rules to be granted.

{¶ 27} OEPA's rationale for the director's removal of the "unless deemed acceptable" language from siting criteria was that the language was duplicative of

existing variance and exemption procedures in R.C. 3734.02(A) and (G). A witness for the OEPA testified that the standard of review in a "deemed acceptable" request was the same as that for an exemption or a variance, the only difference being the manner in which the request is made.

{¶ 28} The utilities argue that they are deprived of a right of review if the director denies or declines to address a request for an exemption. However, nothing in the newly promulgated rules changes the possibility of that outcome from what it was under the 1992 rules. "Unless deemed acceptable" requests that were denied or not acted upon were also not reviewable. Other than requiring a more formal procedure, removal of the "unless deemed acceptable" language left the utilities in the same position they were in under the old rules.

{¶ 29} The second assignment of error is overruled.

{¶ 30} In the third assignment of error, the utilities claim that ERAC incorrectly concluded that the utilities had acquiesced to the siting criteria by failing to challenge the nearly identical regulations in the past. We have reviewed the record in which the utilities claim that ERAC reached this erroneous conclusion, but we can find no support for the argument.

{¶ 31} It is true that OEPA raised this argument at the de novo hearing and in this appeal. However, ERAC merely noted that the 2003 revisions were more technical in nature than substantive and recognized that the siting criteria at issue have been in place since 1976. ERAC did not err in this regard, because it allowed the utilities to challenge all aspects of the revised rules and considered all the evidence.

{¶ 32} The third assignment of error is overruled.

{¶ 33} In the fourth assignment of error, the utilities argue that the director failed to provide an adequate explanation for changing its position to require RSW facilities to obtain exemptions in some cases. Early in the revision process, OEPA indicated that removing the "unless deemed acceptable" language was appropriate because it was essentially duplicative of the variance provision. Later, OEPA required that applicants in some cases seek an exemption and not a variance. For example, a request for relief from the 100 gpm restriction required an exemption rather than a variance. Requiring an exemption instead of a variance is significant to the utilities because denial of a variance is reviewable by ERAC but a failure to act or a denial of an exemption is not reviewable. Since applications for variances or exemptions were reviewed under the same standard used in analyzing waivers under the "unless deemed acceptable" language, there is no difference in the likelihood of a request being granted under either format. As discussed in connection with the second assignment of error, there has been no change in position for a utility that seeks an exemption,

a variance, or an "unless deemed acceptable" waiver. Therefore, the utilities cannot show that they were harmed by the change in procedure.

{¶ 34} In their fifth assignment of error, the utilities contend that removal of the "unless deemed acceptable" language results in an outright prohibition against siting an RSW facility over a 100 gpm aquifer or within 200 feet of surface water. Given that the standards for granting a variance or an exemption are the same as those for deviating from the siting criteria under the "unless deemed acceptable" language, we can find no merit to this assertion. R.C. 3734.02 explicitly allows for variances and exemptions, and the OEPA has granted both. The argument is without merit.

{¶ 35} The fifth assignment of error is overruled.

{¶ 36} Based on the foregoing, the utilities' five assignments of error are overruled, and the final order of the Environmental Review Appeals Commission is affirmed.

Judgment affirmed.

BRYANT and BROWN, JJ., concur.