OPINION
{¶ 1} Appellee-Appellant, Christopher Korleski, Director of the Ohio Environmental Protection Agency ("Ohio EPA"), appeals from an order of the Environmental Review Appeals Commission ("ERAC"). Appellant-appellee, Textileather *Page 2 
Corporation ("Textileather"), also appeals from that order. For the following reasons, we affirm in part and reverse in part.
 {¶ 2} Textileather owns and operates a manufacturing plant situated on 46.88 acres in Toledo, Ohio. Textileather manufactures sheet-rolled vinyl for various applications, such as automobile seat and door coverings. The solvents that Textileather uses in its manufacturing process generate hazardous waste. Throughout the 1980's, Textileather treated its solvent waste to recover usable solvent. Textileather also accepted a competitor's waste solvent and subjected it to the same treatment process. Because Textileather's activities involved the treatment, storage, and disposal of hazardous waste, it became subject to the Ohio Administrative Code provisions that implement the Resource Conservation and Recovery Act of 1976, Section 6901, et seq., Title 42, U.S. Code (hereinafter "RCRA" refers to the Ohio Administrative Code provisions implementing the federal act).[1]
 {¶ 3} Pursuant to the RCRA, any facility that treats, stores, or disposes of hazardous waste must have an operating permit. R.C.3734.05(C); Ohio Adm. Code 3745-50-40. In 1981, the Ohio EPA issued a Part A permit to Textileather. After receiving its Part A permit, Textileather operated its plant under the interim status provisions of the RCRA. Although Textileather sought a Part B permit from the Ohio EPA in 1988, Textileather voluntarily withdrew its application in 1990 when it decided to stop treating waste solvents. Textileather then began the process of shutting down its solvent recovery operation. *Page 3 
 {¶ 4} The RCRA mandates that an owner or operator of a hazardous waste facility must close its facility in a way that ensures that the facility will not pose a future threat to human health and the environment. Ohio Adm. Code 3745-55-11 and 3745-66-11. Pursuant to the RCRA regulations governing closure, Textileather submitted to the Ohio EPA three different closure plans, each addressing a separate hazardous waste management unit ("RCRA unit"). The first RCRA unit consisted of two storage tanks; the second consisted of three storage tanks, the drum storage area contained in Building No. 53, and certain solvent recovery equipment contained in Building No. 31; and the third consisted of the roll off storage area. Textileather used the five tanks primarily for the storage of waste solvent. At the drum storage area, Textileather stored 55-gallon drums containing wastes discarded after the manufacturing process.
 {¶ 5} By September 1992, the Ohio EPA had approved all three closure plans and Textileather set about implementing them. As part of this process, Textileather removed the hazardous waste from the storage tanks and storage areas and decontaminated the storage tanks, the piping associated with the storage tanks, the storage areas, and the solvent recovery equipment. After Textileather completed the decontamination, it collected soil samples from the area of the tank system, the drum storage area, and the roll off storage area.[2] Analysis of these samples revealed residual hazardous waste contamination that exceeded Textileather's expectations. Thus, in 1993, Textileather amended all three closure plans to include a "Human Health Risk Assessment" ("Risk Assessment"). *Page 4 
 {¶ 6} Originally, Textileather's closure plans called for the removal of all hazardous waste. The Risk Assessment, however, proposed that the Ohio EPA allow closure even though some residual hazardous waste would remain in the soil. In the Risk Assessment, Textileather disclosed that it had collected 74 surface soil samples from the site and detected a number of volatile organic compounds ("VOCs") in the samples, including methyl ethyl ketone ("MEK"), n, n-dimethylformamide ("DMF"), and tetrahydrofuran ("THF").[3] After conducting a risk-based analysis (also called a risk assessment), Textileather opined that the chemical constituents in the soil did not pose an unacceptable risk to human health.
 {¶ 7} Notably, although the Risk Assessment evaluated the dangers that MEK and DMF presented to human health, it did not analyze THF as a chemical of interest. Textileather advanced two reasons for not including THF: (1) the low toxicity of THF, and (2) the lack of the toxicity data necessary to set health criteria for THF.
 {¶ 8} On August 31, 1994, the Ohio EPA issued a Notice of Deficiency ("NOD") that enumerated the deficiencies in the three closure plans, as amended by the Risk Assessment. Importantly, the NOD stated that:
 [Textileather] has failed to define adequately the full horizontal and vertical extent of contamination at each of the closure areas.[4]
* * * For non-naturally occurring compounds, environmental media is considered contaminated if detected above the lowest method detection limit (MDL). To define the horizontal extent of contamination, [Textileather] shall analyze additional surface points in a linear progression away from the outer surface points (s) [sic] where contamination was detected. Once a decreasing trend in contaminant concentration (below the health based standard) has been *Page 5 
established with a minimum of three (3) data points in the direction of the apparent release, the horizontal extent of contamination will have been defined. To establish the vertical extent of contamination, [Textileather] shall analyze soil samples at specific depth intervals until the analytical results indicate that hazardous constituents are below the MDL in three consecutive samples. If the saturated zone is encountered while defining the vertical extent of contamination, [Textileather] shall determine if ground water quality has been affected. If ground water quality has been affected, [Textileather] shall revise the plan to address this additional contamination. Also, [Textileather] shall submit the sampling and analysis plan (SAPs) defining the extent of contamination as required by the approved closure plan.
(Emphasis in original).
 {¶ 9} Also, the NOD provided that "[t]o eliminate tetrahydrofuran (THF) from consideration due to toxicity values not being available is unacceptable." The NOD directed Textileather to "remove [THF] to the lowest [method detection limit]."
 {¶ 10} Generally, upon receipt of a NOD, the owner/operator must submit a modified closure plan addressing the deficiencies of its previously submitted plan. After discussions with Textileather and its agent, Conestoga-Rovers and Associates, the Ohio EPA allowed Textileather to submit a sampling and analysis plan ("SAP") instead of an amended closure plan. In part, the SAP specified what sampling and analysis Textileather had to complete in order to fully define the rate and extent of contamination. The SAP required Textileather to collect soil samples, each at a designated location within the site, to analyze for the presence of VOCs. All of the samples would be collected at a two to three foot depth interval; a lower depth than the previous samples. Although the Ohio EPA approved the SAP, it also cautioned Textileather that it may have to conduct additional sampling if the SAP did not render results that completely defined the rate and extent of contamination. *Page 6 
 {¶ 11} Textileather performed the SAP in July 1995 and submitted the results to the Ohio EPA on August 18, 1995. Textileather maintained that the results of the SAP showed the full horizontal and vertical rate and extent of contamination. The Ohio EPA disagreed. In order to resolve their differences, the parties agreed that Textileather would conduct an additional SAP. This second SAP, approved on April 11, 1996, required Textileather to collect soil samples from even deeper levels beneath the surface and to analyze those samples for certain VOCs.
 {¶ 12} Although Textileather had conducted soil sampling in 1995 without any problem, the wetter weather conditions of 1996 prevented Textileather from sampling as required under the second SAP. Shallow perched water infiltrated some of the sampling holes, creating the possibility of contamination. Despite its inability to fully implement the second SAP, Textileather contended that the results it did obtain demonstrated that it had "sufficiently delineated the area for all parameters of potential concern." In the August 5, 1996 letter accompanying the analytical reports generated by the second SAP, Textileather further stated:
 To date, we have collected approximately 100 samples in an area that is less than 10,000 square feet. Instead of spending additional time and resources to converge on an extremely low concentration of five (5) parts per billion (ppb) defined as non-detect for BTEX[5] parameters in this case, we feel it would be more appropriate to direct these resources towards bringing this project to a close in a timely manner. It is in the best interest of both parties and the public to * * * apply the risk assessment to the volatiles with the vast data we have already collected. *Page 7 
 {¶ 13} Textileather's argument failed to persuade the Ohio EPA. In an October 22, 1996 letter, the Ohio EPA concluded that the second SAP remained incomplete, thus rendering the rate and extent of contamination undefined. The Ohio EPA recommended that Textileather revise the second SAP to include the installation of groundwater monitoring wells if Textileather could not collect the required soil samples.
 {¶ 14} While developing a response to the Ohio EPA's October 22, 1996 letter, Textileather discovered data from 1995 that measured the level of VOCs in the groundwater in the vicinity of the RCRA units. In a January 24, 1997 letter to the Ohio EPA that accompanied a report of the groundwater data, Textileather indicated that the VOC levels measured in the groundwater were "well below" the maximum contaminant levels established by the US EPA Office of Water. Based upon the minimal groundwater contamination and the fact that the soil samples previously collected showed decreasing contaminant levels with depth, Textileather contended that additional soil and/or groundwater sampling was not necessary.
 {¶ 15} In late January 1997, Timothy Killeen, the Ohio EPA employee overseeing the closure process, and Douglas Miller, Textileather's Environmental Manager, discussed the status of Textileather's quest to achieve closure. Killeen stated that, in order to achieve closure, Textileather should resubmit a closure plan along with a risk assessment updated to reflect the most recent sampling and analytical data. Following Killeen's instruction, Textileather submitted an "Amended Closure Plan and Amended Risk Assessment ("Amended Closure Plan") for the three RCRA units on May 23, 1997.
 {¶ 16} After reviewing the data supporting the Amended Closure Plan, the Ohio EPA became concerned about the high level of THF present in the groundwater near the *Page 8 
tank system. Representatives of the Ohio EPA and Textileather met twice in the summer of 1998 to discuss the THF level as well as other issues arising from the Amended Closure Plan. Significant discussion concentrated upon the level of THF detected at monitoring well 14 ("MW-14"). Textileather maintained that the THF found at MW-14 emanated from underground storage tanks ("USTs") that were located approximately 60 feet east of the tank system.[6] Textileather used the USTs to store raw materials, including THF. Because the USTs were not part of the RCRA units, Textileather asserted that the Amended Closure Plan need not address the remediation of any contamination that originated there.
 {¶ 17} While the Ohio EPA recognized that the USTs could be a source of the THF observed at MW-14, it believed that the tank system could not be ruled out as an alternate or additional source without further investigation. After negotiation, the parties agreed upon a plan to ascertain the source of the THF. Pursuant to this plan, Textileather collected samples of shallow perched water from three locations, analyzed the samples for THF, and compared the levels of THF in the three samples. Textileather collected the first sample from a geoprobe located within the footprint of the tank system, and the second from a geoprobe located approximately midway between the tank system and MW-14. At the same time Textileather collected the two geoprobe samples, it also collected a sample from MW-14.
 {¶ 18} Textileather and the Ohio EPA agreed that if the analytical results showed a decreasing trend of THF concentrations from the tank system toward MW-14, then the THF originated from the tank system and Textileather would address THF in the closure *Page 9 
of the RCRA units. If the concentrations of THF were consistent in all three locations, then the THF might have originated from the tank system and Textileather would address THF in the closure. Finally, if the concentrations of THF showed a "definitive increasing trend" from the tank system toward MW-14, then the data would confirm that the THF originated from the USTs and Textileather would not address THF in the closure.
 {¶ 19} Unfortunately, the sampling results were mixed. At the tank system geoprobe, the concentration of THF was 120,000 parts micrograms per liter. At the midpoint geoprobe, the concentration increased to 1,700,000 parts micrograms per liter. At MW-14, however, the concentration dropped to 750,000 parts micrograms per liter.
 {¶ 20} In the September 16, 1998 letter in which Textileather shared these results with the Ohio EPA, Textileather stated:
 Based upon the above-reported THF concentrations, THF is at significantly higher concentrations at both of the samples collected from the area of the former USTs. Therefore, the source of THF in the perched water must be from a location(s) other than the [RCRA units] subject to the above-referenced Amended Closure Plan. Therefore, as agreed to with OEPA * * * THF is not a constituent to be addressed under the Amended Closure Plan.
 {¶ 21} In an October 20, 1998 letter, the Ohio EPA rejected Textileather's interpretation of the THF data, responding that "[t]he results of the groundwater sampling did not meet any of the criteria agreed upon * * *." Further, because the groundwater in the vicinity flowed from the area of tank system toward MW-14, the Ohio EPA concluded that the tank system "is a likely source of THF contamination and thus THF cannot be eliminated from the RCRA closure."
 {¶ 22} On December 23, 1998, the Ohio EPA issued a NOD setting forth the deficiencies in Textileather's Amended Closure Plan. Once again, the Ohio EPA *Page 10 
contended that Textileather had yet to adequately define the rate and extent of the contamination. The Ohio EPA reminded Textileather that it had never completed the second SAP (which Textileather implemented to define the rate and extent of contamination, but halted when perched water infiltrated the samples). The Ohio EPA ordered Textileather to install monitoring wells so that the rate and extent of contamination could be determined.
 {¶ 23} Also, the Ohio EPA restated in the NOD that it believed that the THF detected at MW-14 emanated from the tank system. The Ohio EPA cited two reasons for its belief: (1) Textileather stored THF in the tank system, and (2) Textileather found THF in the shallow soils surrounding the tank system. The Ohio EPA recognized that THF was not detected in a significant concentration in that soil, but attributed the low concentration to THF's high vapor pressure, which causes it to easily escape into the atmosphere, and its high water solubility, which causes it to rapidly leach into the groundwater. Because the Ohio EPA believed that the THF originated from the tank system, it required that all further investigations into the rate and extent of contamination include THF.
 {¶ 24} Through the spring and summer of 1999, the Ohio EPA and Textileather debated what steps Textileather would take in response to the NOD. Ultimately, the parties agreed that Textileather would implement a third SAP to finally and fully characterize the rate and extent of contamination. In August 1999, Textileather submitted just such a plan to the Ohio EPA and the Ohio EPA approved the plan.
 {¶ 25} Pursuant to the third SAP, Textileather installed piezometers to determine the direction of the groundwater flow in the vicinity of the RCRA units. Textileather also *Page 11 
sampled the groundwater at designated piezometers and monitoring wells and analyzed the samples for contaminants. Upon completion of the third SAP, Textileather shared the results with the Ohio EPA. In a February 25, 2000 letter accompanying the results, Textileather noted that it detected nine VOCs in the groundwater samples taken from the monitoring wells and piezometers located within approximately 100 feet of the tank system. However, only two VOCs appeared at levels higher than their respective maximum contaminant level. Further, Textileather pointed out that it did not find MEK or DMF at the locations where it detected THF in high concentrations. Textileather found this significant because it believed that THF emanating from the tank system would be commingled with the other waste solvent constituents stored in the tanks (such as MEK and DMF).
 {¶ 26} In a March 24, 2000 letter responding to the results of the third SAP, the Ohio EPA concluded that Textileather had "adequately defined the rate, extent, and concentrations of hazardous waste constituents in the shallow saturated zone downgradient of the RCRA unit." Additionally, the Ohio EPA stated that while it did "not disagree * * * that sources other than the RCRA unit may have impacted the shallow ground water at the facility," it still believed that the tank system was one of the sources of the groundwater contamination. In response to Textileather's assertion that THF emanating from the tank system would be mixed with DMF and/or MEK, the Ohio EPA stated that:
 [Q]ualitatively speaking, all three of these [VOCs] have different chemical and physical attributes which affect their mobility in saturated and unsaturated zones; the fact that they are not commingled does not necessarily eliminate them from emanating from the same source. *Page 12 
 {¶ 27} Following the Ohio EPA's evaluation of the results of the third SAP, the parties began negotiating parameters for a new risk assessment. Textileather set forth its preferred method for conducting the risk assessment in a letter dated April 11, 2000. The Ohio EPA responded with an August 17, 2000 letter stating:
 Several members of Ohio EPA's staff have reviewed the [proposal] and recommended that some elements of the proposal should be incorporated in the facility's closure plan. Therefore, Ohio EPA intends to approve the Amended Closure Plan * * * with modifications.
 {¶ 28} On November 28, 2001, the Director of the Ohio EPA ("Director") issued the Amended Closure Plan Approval ("ACPA"). This final action included a 38-page attachment that listed 36 modifications to the Amended Closure Plan. The Ohio EPA maintained that such significant modifications were necessary because Textileather never adequately characterized the rate and extent of the soil and groundwater contamination. As part of these modifications, the Ohio EPA scrapped Textileather's risk assessment and conducted its own risk assessment that resulted in cleanup standards for a number of contaminants, including some never detected within or near the RCRA units. The ACPA also required that Textileather implement an extensive groundwater monitoring program.
 {¶ 29} Textileather timely appealed the Director's action to ERAC on December 28, 2001. ERAC held a de novo hearing on January 10 through 14, 2005. On August 22, 2006, ERAC issued its Findings of Fact, Conclusions of Law, and Final Order, in which it affirmed in part and reversed in part the ACPA. Pursuant to R.C. 3745.06, both the Ohio EPA and Textileather now appeal that final order to this court.
 {¶ 30} The Ohio EPA assigns the following errors: *Page 13 
 [1.] The Environmental Review Appeals Commission erred by failing to find the Director's action approving a closure plan with modifications lawful and reasonable.
 [2.] The Director's decision that rate and extent had not been defined was reasonable and lawful.
 [3.] The Environmental Review Appeals Commission erred in concluding that Textileather is not currently a treatment, storage or disposal facility.
 [4.] The Environmental Review Appeals Commission erred in determining that closure of hazardous waste units at Textileather is governed by interim standards and not by general facility standards.
 {¶ 31} On cross-appeal, Textileather assigns the following errors:
 [1.] THE ERAC ERRED WHEN IT ALLOWED THE OHIO EPA TO GIVE THE CLOSURE PLAN REVIEW GUIDANCE THE EFFECT OF LAW WHERE THE GUIDANCE WAS NOT PROMULGATED UNDER CHAPTER 119 OF THE OHIO REVISED CODE.
 [2.] THE ERAC ERRED AS A MATTER OF LAW AND FACT BY FAILING TO REVERSE THE DIRECTOR'S REQUIREMENT THAT TEXTILEATHER ADDRESS TETRAHYDROFURAN AND PHTHALATES IN THE CLOSURE PLAN.
 [3] THE ERAC ERRED BY FAILING TO REVERSE THE DIRECTOR'S RISK-BASED CLEANUP STANDARD FOR VINYL CHLORIDE BECAUSE THE STANDARD CANNOT BE MEASURED AND BECAUSE THIS DETERMINATION CONFLICTS WITH THE ERAC'S DETERMINATION THAT THE RISK BASED STANDARDS ARE UNREASONABLE AND UNLAWFUL.
 {¶ 32} When reviewing a final action of the Director, ERAC must determine whether the action is "unreasonable or unlawful." R.C.3745.05. In contrast to ERAC's standard of review, this court reviews an order from ERAC to determine whether it "is *Page 14 
supported by reliable, probative, and substantial evidence and is in accordance with law." R.C. 3745.06.
 {¶ 33} We will address the assignments of error out of order, and we begin our analysis by determining what law governs this matter. By the Ohio EPA's third and fourth assignments of error, it argues that the general standards, and not the interim standards, govern the closure of the RCRA units.[7] We disagree.
 {¶ 34} With little exception, all facilities that treat, store, or dispose of hazardous waste must comply with either the general standards or the interim standards. Consequently, an owner or operator of a hazardous waste facility must close that facility under either Ohio Adm. Code 3745-66-11 (the interim standard) or Ohio Adm. Code 3745-55-11
(the general standard).[8] Both standards require an owner or operator of a hazardous waste facility to "[c]ontrol[ ], minimize[ ], or eliminate[ ] to the extent necessary to protect human health and the environment, post-closure escape of hazardous waste, hazardous constituents, leachate, contaminated run-off, or hazardous waste decomposition products to the ground water, or surface waters, or to the atmosphere." Ohio Adm. Code 3745-66-11(B) and 3745-55-11(B). Although the overarching duty is the same, the specific requirements underlying the duty differ depending upon whether the interim standards or the general standards govern the closure. Significant to this case, closure under the interim standards would mean that the Ohio EPA could subject *Page 15 
Textileather to the groundwater monitoring requirements contained in Ohio Adm. Code 3745-65-90 through 3745-65-94. Closure under the general standards would allow the Ohio EPA to require compliance with the more onerous groundwater monitoring requirements of Ohio Adm. Code 3745-54-90
through 3745-55-02.
 {¶ 35} In order to determine which set of standards apply, we must interpret Ohio Adm. Code 3745-54-03, which reads:
 An owner or operator of a hazardous waste facility that was in operation immediately prior to October 9, 1980 * * * shall comply with the standards set forth in Chapters 3745-65 to 3745-69 [the interim standards] * * * of the Administrative Code in lieu of the standards in Chapters 3745-54 to 3745-57 [the general standards] * * * of the Administrative Code until final administrative disposition of his permit application is made pursuant to the "Part B" permit requirements * * *
 {¶ 36} In the case at bar, ERAC found that Textileather was a hazardous waste facility in operation immediately prior to October 9, 1980. The Ohio EPA does not dispute this finding. Therefore, pursuant to Ohio Adm. Code 3745-54-03, the determinative factor is whether a "final administrative disposition" of Textileather's Part B permit application ever occurred. If the Ohio EPA made a "final administrative disposition" of Textileather's Part B permit application, then the general standards govern the closure of the RCRA units. On the other hand, without such a disposition, the interim standards govern.[9]
 {¶ 37} Ohio Adm. Code 3745-54-03 does not define what constitutes a "final administrative disposition." However, the phrase "final administrative disposition" appears *Page 16 
in multiple rules, and Ohio Adm. Code 3745-50-40 — the rule governing the submittal of permit applications — includes a specific definition. As used in Ohio Adm. Code 3745-50-40, "final administrative disposition" means that "the director shall approve or disapprove the Part B application * * *." Ohio Adm. Code 3745-50-40(C)(7)(b). This definition is consistent with the common, everyday meanings of the relevant terms. See MP Star Financial, Inc. v. Cleveland State Univ.,107 Ohio St.3d 176, 2005-Ohio-6183, at ¶ 8 ("[U]ndefined [statutory] terms are to be accorded their common, everyday meaning.") (Emphasis omitted). "Administrative" is defined as "of, belonging to, [or] proceeding from * * * an administration." Webster's Third New International Dictionary (1961) 28. "Dispose" means "to arrange or settle a matter finally or definitively: make disposition; esp.: to regulate the fate or condition finally or definitively." Id., at 654. Construing these definitions together, we conclude that a "final administrative disposition" is the Ohio EPA's final and definitive decision regarding a Part B permit application. Here, because Textileather withdrew its Part B permit application before the Ohio EPA rendered any final and definitive decision, the Ohio EPA never made a "final administrative disposition" of the application. Necessarily, then, the interim standards govern the closure of the RCRA units.
 {¶ 38} Given the plain language of Ohio Adm. Code 3745-54-03, we are not persuaded by the Ohio EPA's argument that the expiration of Textileather's Part A permit subjected it to the general standards. In support of this argument, the Ohio EPA relies upon Ohio Adm. Code3745-50-56, which designates the circumstances under which a hazardous waste facility may continue to operate under the terms and conditions of an expired permit. Contrary to the Ohio EPA's argument, that rule does not address the *Page 17 
application of the interim standards or the general standards at all; much less dictate that the general standards govern the closure of a facility once the facility's Part A permit has expired. Under the applicable rule — Ohio Adm. Code 3745-54-03 — the validity or invalidity of a Part A permit plays no role in determining whether the interim standards or the general standards apply.
 {¶ 39} The Ohio EPA next argues that the general standards control the closure of the RCRA units because Textileather continues to store hazardous waste even today. In support of this argument, the Ohio EPA points to Ohio Adm. Code 3745-52-34(B). Read in full, Ohio Adm. Code3745-52-34(B) states that hazardous waste generators who accumulate hazardous waste on site for more than 90 days are storage and/or treatment facilities and are subject a variety of rules, including OhioAdm. Code 3745-54-03. Thus, status as a storage facility under Ohio Adm. Code 3745-52-34(B) does not dictate which set of standards governs the facility. Even if Textileather currently operates as a storage facility, Ohio Adm. Code 3745-54-03 still applies, making the determinative factor whether or not the Ohio EPA ever rendered a "final administrative disposition" of Textileather's Part B application. Because the Ohio EPA failed to make such a disposition, the interim standards govern. Accordingly, we find that ERAC's decision is in accordance with law, and thus, we overrule the Ohio EPA's third and fourth assignments of error.
 {¶ 40} Next, we must determine what effect, if any, the Closure Plan Review Guidance ("CPRG") has in the instant case. The CPRG memorializes the Ohio EPA's interpretation of the closure regulations. In Textileather's first assignment of error, it argues that ERAC erred in allowing the Ohio EPA to incorporate parts of the CPRG into the ACPA. Textileather asserts that the requirements based upon the CPRG must be *Page 18 
excised from the ACPA because the CPRG was not promulgated in accordance with R.C. Chapter 119 and is therefore invalid. We disagree.
 {¶ 41} R.C. 3734.12 confers upon the Director the responsibility to adopt rules that are consistent with and equivalent to the RCRA. Among other rules, the Director must adopt a rule establishing requirements for the "[c]losure and post-closure care of a hazardous waste facility where hazardous waste will no longer be treated, stored, or disposed of * * *." R.C. 3734.12(D)(8). The Director must comply with the procedures prescribed in R.C. Chapter 119 when adopting a rule. R.C. 119.02. Failure to do so invalidates the rule. Id.
 {¶ 42} Acting in accordance with R.C. 3734.12(D)(8), the Director adopted Ohio Adm. Code 3745-66-11, which requires an owner/operator to close a hazardous waste facility in a manner that "[c]ontrols, minimizes, or eliminates, to the extent necessary to protect human health and the environment, post-closure escape of hazardous waste, hazardous constituents, leachate, contaminated run-off, or hazardous waste decomposition products to the ground water, or surface waters, or to the atmosphere." To assist the Ohio EPA staff in interpreting this rule (and other rules governing closure), the Ohio EPA drafted the CPRG. The Ohio EPA views the CPRG as a guidance document and not a rule. Consequently, the Director did not adopt the CPRG pursuant to the procedures of R.C. Chapter 119. If the Ohio EPA has erred in its characterization of the CPRG and it is, in actuality, a rule, then it is invalid and unenforceable against Textileather because the Director did not properly adopt it.
 {¶ 43} According to R.C. 119.01(C), a "rule" is:
 [A]ny rule, regulation, or standard, having a general and uniform operation, adopted, promulgated, and enforced by *Page 19 
any agency under the authority of the laws governing such agency * * * `Rule' does not include any internal management rule of an agency unless the internal management rule affects private rights * * *
 {¶ 44} Although the Ohio EPA calls the CPRG a guidance document, how an agency characterizes a document does not denote its true nature.State ex rel. Saunders v. Indus. Comm., 101 Ohio St.3d 125,2004-Ohio-339, at ¶ 26. In deciding whether a document is a rule, a court must concentrate on the effect of the document, not its label. Id. "The pivotal issue in determining the effect of a document is whether it enlarges the scope of the rule or statute from which it derives rather than simply interprets it." Id., at ¶ 27. Documents that explain, rather than expand, the language used in a rule are exempt from the R.C. Chapter 119 requirements. Id., at ¶ 33.
 {¶ 45} In the case at bar, the ACPA requires Textileather to comply with the CPRG when conducting a statistical analysis of the samples that Textileather must take to confirm that it sufficiently remediated the soil. The ACPA also states that if Textileather chooses to recalculate the risk assessment standards, it must do so using parameters set forth in the CPRG. Finally, the Ohio EPA followed the parameters set forth in the CPRG when conducting its own risk assessment.
 {¶ 46} In each of the instances in which the Ohio EPA relied upon or directed Textileather to abide by the CPRG, Ohio Adm. Code 3745-66-11(B) served as the basis for the pertinent CPRG provisions. Ohio Adm. Code3745-66-11(B) creates a broad duty, and the provisions of the CPRG provide the specifics by which the Ohio EPA (and owners/operators) can gauge whether a particular closure plan satisfies that broad duty. None of the operative CPRG provisions extends or increases the duty Ohio Adm. Code 3745-66-11(B) imposes. Thus, we find that in translating the general to the specific, the *Page 20 
CPRG is interpreting — not enlarging — Ohio Adm. Code 3745-66-11(B). The CPRG, consequently, need not be adopted via R.C. Chapter 119 procedures.
 {¶ 47} Textileather argues that the CPRG is a rule because it explicates a vague rule, is obligatory in nature, and is treated by the Ohio EPA as controlling. However, in advancing these alternative criteria with which to judge whether the CPRG is a rule, Textileather relies upon nonbinding precedent. Specifically, Textileather points toGeneral Electric Co. v. EPA (C.A.D.C.2002), 290 F.3d 377, a case we previously found to be "helpful" in understanding the term "substantive." See General Elec. Lighting v. Koncelik, Franklin App. No. 05AP-310, 2006-Ohio-1655, at ¶ 30-31. Although General Electric Co. v.EPA was helpful in another context, we cannot replace binding Supreme Court of Ohio precedent with another court's approach to determining whether a document is a rule. Thus, we decline to consider the criteria set forth in General Electric Co. v. EPA.
 {¶ 48} Because the CPRG is not a rule, ERAC acted in accordance with law in refusing to eliminate any requirement from the ACPA on the basis that the Ohio EPA derived that requirement from the CPRG.[10]
Accordingly, we overrule Textileather's first assignment of error.
 {¶ 49} We next turn to the Ohio EPA's first assignment of error, whereby the Ohio EPA argues that ERAC erred in finding that the Director could not approve the Amended Closure Plan with extensive modifications. We disagree. *Page 21 
 {¶ 50} In the case at bar, ERAC found that the Director's issuance of an approval with modifications was inappropriate given the significant and substantial nature of the changes the agency made. Based upon the Ohio EPA's own interpretation of the relevant rule, ERAC concluded that issuance of a NOD was the more reasonable course of action. The Ohio EPA now argues that the Director's decision to approve the Amended Closure Plan with modifications was lawful and reasonable, and that ERAC substituted its judgment for that of the Director in finding otherwise.
 {¶ 51} When presented with a closure plan, the Director must "approve, modify, or disapprove the plan * * *." Ohio Adm. Code 3745-66-12(D)(4). If the Director does not approve the plan, he must "provide the owner or operator with a detailed written statement of reasons for the refusal * * *." Id.
 {¶ 52} The Ohio EPA has interpreted these provisions in the CPRG. In Section 2.5, the Ohio EPA states that Ohio Adm. Code 3745-66-12(D)(4) presents the agency with four options:
 (1) Approve the plan as received;
 (2) Modify the plan i.e., approval with modifications;
 (3) Disapprove the plan; or
 (4) Neither approve nor disapprove the plan but rather issue a "Notice of Deficiency" letter * * *
(Emphasis in original). According to Section 2.5.1 of the CPRG, if the Ohio EPA receives an unacceptable closure plan, it must use a NOD "to communicate the deficiencies" in the plan and to "provide specific, detailed and clear directives telling the owner/operator what Ohio EPA wants to see in the plan * * *." Section 2.5.1 also specifies when the Ohio EPA must "modify" the plan instead of using a NOD: *Page 22 
 [T]he Agency can, and often does, establish further modifications through the closure plan approval letter which become part of the closure plan. The latter option may be used where modifications to the plan are limited to a reasonable number. Basic, fundamental, substantive components of a plan should be required through the NOD.
(Emphasis in original).
 {¶ 53} Thus, pursuant to the Ohio EPA's interpretation of Ohio Adm. Code 3745-66-12(D)(4), the Ohio EPA may effect change in a plan in two ways: through modifying the plan or issuing a NOD. The Ohio EPA construes "modify" to mean incorporation of a "reasonable number" of changes into the plan. Changes to "basic, fundamental, [or] substantive components of a plan" do not constitute modification and instead require a NOD.
 {¶ 54} Courts must accord "considerable deference * * * to an agency's interpretation of rules the agency is required to administer." State exrel. Celebreeze v. National Lime Stone Co., 68 Ohio St.3d 377, 382,1994-Ohio-486. Unless the agency's interpretation is unreasonable or conflicts with a statute covering the same subject matter, courts should follow that interpretation. Id.; City of Salem v. Koncelik,164 Ohio App.3d 597, 2005-Ohio-5537, at ¶ 16. In the case at bar, the Ohio EPA's interpretation of Ohio Adm. Code 3745-66-12(D)(4) is neither unreasonable nor contrary to statute, and thus, we must give it due deference. Applying Ohio Adm. Code 3745-66-12(D)(4) as the Ohio EPA has interpreted it, we conclude that ERAC's order mandating a NOD in place of an approval with modifications is proper if reliable, probative, and substantial evidence establishes that the Ohio EPA made "basic, fundamental, [or] substantive" changes to the plan. *Page 23 
 {¶ 55} Here, the Director approved Textileather's Amended Closure Plan with 36 modifications. In a June 18, 2001 memorandum from Ed Hammett (District Chief of the Northwest District Office) and Michael A. Savage (Chief of the Division of Hazardous Waste Management) to Joseph Koncelik (then the Assistant Director of the Ohio EPA), Hammett and Savage characterized the modifications as "significant." In her hearing testimony, Stephanie Beak, Supervisor of the Risk Assessment Unit in the Division of Hazardous Waste Management, stated that it was not "normal" for the agency to draft modifications as "substantial" as those made to Texti leather's Amended Closure Plan. In particular, Beak testified that the owner/operator — not the Ohio EPA — normally performs he risk assessment and that the Ohio EPA took an unusual step by conducting such a basic and important part of the plan itself.
 {¶ 56} We find that this evidence constitutes the reliable, probative, and substantial evidence necessary to support ERAC's finding that the Ohio EPA's modifications to the plan were basic, fundamental, and substantive. Given the nature of the changes to the Amended Closure Plan, a NOD — not an approval with modifications — was the proper course of action. Accordingly, we overrule the Ohio EPA's first assignment of error.
 {¶ 57} By the Ohio EPA's second assignment of error, it argues that ERAC erred in concluding that Textileather adequately defined the rate and extent of contamination. We disagree.
 {¶ 58} Throughout the closure plan review process, the parties dickered over whether Textileather ever fully characterized the rate and extent of the soil and groundwater contamination. At the hearing before ERAC, Jack Michels, Texti leather's expert witness, testified that the extensive sampling and analysis of the soil and *Page 24 
groundwater surrounding the RCRA units established the rate and extent of contamination. With regard to the soil contamination, Michels found support for his opinion in the results of the over 100 soil samples collected and analyzed in 1992, 1995, and 1996. With regard to the groundwater contamination, Michels based his opinion upon data from the sampling and analysis carried out in 1995, 1998, and 1999. In particular, Michels relied upon the 1999 results from the third SAP, which Textileather and the Ohio EPA agreed would "once and for all" determine the rate and extent of contamination. Michels testified that the groundwater samples taken from wells immediately downgradient of the RCRA units contained contaminants, but that wells located further downgradient from the RCRA units showed little, if any, contamination.
 {¶ 59} As further support for its contention that it fully defined the rate and extent of contamination, Textileather points to the Ohio EPA's own statements, particularly the Ohio EPA's concession, made in the March 24, 2000 letter, that:
 Textileather Corporation has adequately defined the rate, extent, and concentrations of hazardous waste constituents in the shallow saturated zone downgradient of the RCRA unit.
John Weaver, an Ohio EPA groundwater specialist, made this same statement in a March 8, 2000 internal memorandum.
 {¶ 60} Based upon Michel's testimony and the Ohio EPA's statements, we conclude that reliable, probative, and substantial evidence supports ERAC's finding that Textileather defined the rate and extent of the soil and groundwater contamination. In so finding, we reject the Ohio EPA's arguments to the contrary. ERAC did not ignore the Ohio EPA's evidence; rather, it chose to rely upon other evidence. Apparently, ERAC discounted the testimony of the Ohio EPA's witnesses due to the agency's changeable *Page 25 
position on the question of rate and extent. The Ohio EPA conceded that Textileather had determined the rate and extent of contamination, remained silent for 18 months, and then without explanation declared the opposite. In light of this behavior, ERAC concluded that the Ohio EPA's position was unreasonable. As reliable, probative, and substantial evidence supports ERAC's conclusion, we must affirm it. Accordingly, we overrule the Ohio EPA's second assignment of error.
 {¶ 61} By Textileather's second assignment of error, it argues that ERAC erred in affirming the Director's inclusion of THF and phthalates in the ACPA. With regard to THF, Textileather makes two arguments. First, it contends that Ohio Adm. Code 3754-66-11 does not regulate THF and, thus, the Ohio EPA may not lawfully require Textileather to address it in the closure of the RCRA units. Second, Textileather contends that no reliable, probative, and substantial evidence supports ERAC's finding that the THF detected near the RCRA units could be attributed to the RCRA units. We disagree with both arguments.
 {¶ 62} Ohio Adm. Code 3745-66-11(B) requires owners or operators to close a facility in such a way as to protect human health and the environment from hazardous waste, hazardous constituents, leachate, contaminated run-off, and hazardous waste decomposition products. Textileather contends that THF does not qualify as any of these regulated substances. Killeen,[11] however, testified that THF is a hazardous waste under the "mixture rule," which states that a mixture of a waste and a hazardous waste listed in Ohio Adm. Code 3745-51-30 to3745-51-35 is a hazardous waste. Ohio Adm. Code 3745-51-03(A)(2)(c) and (e). Textileather concedes that THF is a waste and that it mixed the *Page 26 
THF at issue with spent MEK, a hazardous waste listed in Ohio Adm. Code3745-51-31. Therefore, pursuant to the mixture rule, THF is a hazardous waste in this instance.
 {¶ 63} Instead of attacking the evidentiary basis underlying this conclusion, Textileather urges this court to disregard the mixture rule because, it contends, the rule leads to absurd results. As an example, Textileather points out that adding milk to MEK would render milk a hazardous waste. We find Textileather's argument unavailing. Courts only resort to the use of the statutory rules of construction — including the avoidance of absurd results — if the relevant statute, rule, or regulation is ambiguous. Village of Silver Lake v. Metro RegionalTransit Auth., 111 Ohio St.3d 324, 2006-Ohio-5790, at ¶ 17. In the absence of ambiguity, courts must apply the statute, rule, or regulation as written. State ex rel. Dispatch Printing Co. v. Johnson,106 Ohio St.3d 160, 2005-Ohio-4384, at ¶ 21. Here, Textileather challenges only the rationale of the rule, and not its clarity. As Textileather does not argue that the rule is ambiguous, we must apply the rule without consideration of the alleged absurdity that results. The legislature, not the judiciary, is the proper forum for Texti leather's complaint that the rule lacks a sound rationale in all cases.
 {¶ 64} Textileather next argues that even if THF is a hazardous waste, the Ohio EPA should have excluded it from the ACPA because it did not emanate from the RCRA units. It is uncontested that Textileather stored THF, as well as substances that included THF as a constituent, in the tank system. It is also uncontested that Textileather detected THF in the soil and groundwater surrounding the tank system. Textileather, however, asserts that the THF it found did not disperse from the tank system for four reasons: (1) there is no evidence that the tanks ever leaked, (2) only low levels of THF were detected *Page 27 
in the soil, (3) the USTs and the piping associated with the USTs leaked THF, and (4) the THF detected in the groundwater was not commingled with MEK. We will address each argument in turn.
 {¶ 65} First, Textileather failed to prove that THF ever escaped from the tank system. As early as 1970, Textileather used the tank system to store THF and other waste solvents. Although Ohio Adm. Code 3745-65-15
requires owners/operators to inspect for and document leaks, that rule was not enacted until 1981. Therefore, even assuming Textileather vigilantly followed Ohio Adm. Code 3745-65-15 (a fact not in evidence), undocumented leaks could have occurred prior to 1981. Further, the testimony of Steve Walko and Jerry Larimore, both former Textileather employees, does not prove otherwise. Walko, who testified that he did not recall any leaks from the tanks, did not obtain responsibility for the entire plant (including the tank system) until 1986, and thus would not have necessarily known of a leak prior to then. Larimore, a pipefitter, only testified that he did not recall repairing leaks in thepipes associated with the tank system, not the tanks themselves.
 {¶ 66} Second, the low level of THF in the soil underneath the tank system cannot establish that the THF came from a source other than the tank system. As the Ohio EPA stated in the 1998 NOD and internal memoranda, the soil did not contain elevated concentrations of THF because its high vapor pressure prevented much from absorbing into the soil and its high water solubility caused the THF that did absorb into the soil to leach into the groundwater.
 {¶ 67} Third, the fact that the USTs leaked THF only proves that the USTs contributed to the THF in the soil and groundwater. Indeed, the Ohio EPA concluded in *Page 28 
its March 24, 2000 letter that it did "not disagree with [Textileather's] contention that sources other than the RCRA unit may have impacted the shallow ground water at the facility." A spill or leak from the USTs does not rule out the tank system as an additional source of THF.
 {¶ 68} Finally, the discovery of unadulterated THF in the groundwater does not prove that the THF emanated from the USTs alone. Textileather stored pure, unused THF in the USTs, while spent THF was mixed with MEK in the tank system. However, the detection of THF without MEK is not indicative of the source of the contamination. In a March 24, 2000 letter to Textileather and internal memoranda, the Ohio EPA explained that THF and MEK travel through soil and groundwater at different rates. Thus, THF originating from the tank system would not necessarily be mixed with the slower moving MEK.
 {¶ 69} Textileather contends that neither ERAC nor this court can consider this explanation because no witness testified to it during the hearing. Because the explanation is discussed in multiple documents contained in the certified record and admitted during the hearing, we find Texti leather's argument unavailing. Furthermore, we also disagree with Textileather's assertion that the explanation lacks any valid factual foundation. Textileather failed to introduce at the hearing the deposition testimony that it now uses to impeach the veracity of the explanation. As this deposition testimony is not part of the record, we cannot consider it.
 {¶ 70} In sum, Textileather failed to overcome the reliable, probative, and substantial evidence that THF is a hazardous waste and could have emanated from the tank system. Therefore, we conclude that ERAC properly kept THF in the ACPA. *Page 29 
 {¶ 71} We now turn to the second part of Textileather's second assignment of error; namely, that ERAC erred in allowing the inclusion of phthalates in the ACPA. The ACPA requires Textileather to address the phthalate contamination because Textileather detected liquid phthalates in the groundwater near the RCRA units. Although Textileather never stored phthalates in the tank system, they were present at the drum storage area contained in Building No. 53 (also part of the RCRA units).[12] Textileather, however, contends that the phthalates stored in the drum storage area were in solid, not liquid, form. Because liquid phthalates contaminated the groundwater, Textileather argues that the RCRA units cannot be the source of the phthalate contamination.
 {¶ 72} Notably, the Ohio EPA does not respond to Textileather's argument. Nevertheless, we are not persuaded by it. After an independent review of the record, we cannot find any evidence that Textileather stored only solid phthalates at the drum storage area. Textileather bore the burden of proving that the Ohio EPA acted unreasonably or unlawfully in requiring Textileather to remove phthalates from the soil and groundwater near the RCRA units. Ohio Adm. Code 3746-5-30; Johnson'sIsland Prop. Owners' Assn. v. Schregardus (1995), 104 Ohio App.3d 563,568. Textileather failed to meet this burden because it did not establish that the only phthalates at the drum storage area were solid phthalates incapable of causing the groundwater contamination. Accordingly, ERAC did not err in retaining phthalates in the ACPA. *Page 30 
 {¶ 73} Because reliable, probative, and substantial evidence supports the inclusion of THF and phthalates in the ACPA, we overrule Textileather's second assignment of error.
 {¶ 74} By Textileather's third assignment of error, it argues that ERAC erred when it reached contradictory conclusions of law regarding the cleanup standard for vinyl chloride. We agree.
 {¶ 75} In its decision, ERAC concluded that "the risk assessment calculations and resulting cleanup standards, which were predicated on [ ] impermissibly large lists [of chemicals], are [ ] unreasonable and unlawful." In another section of its order, ERAC specifically addressed the cleanup standard for one chemical — vinyl chloride. Textileather asserted that the vinyl chloride cleanup standard was unreasonable and unlawful because the Ohio EPA set the standard below the limit that instruments could detect. Disagreeing with this specific argument, ERAC concluded that the cleanup standard for vinyl chloride was reasonable and lawful.
 {¶ 76} ERAC's first conclusion of law — that all the cleanup standards were unreasonable and unlawful — mooted Textileather's challenge to the cleanup standard for vinyl chloride. Thus, regardless of ERAC's finding as to the vinyl chloride cleanup standard, its earlier, broader conclusion rejecting all the cleanup standards predominates. In other words, ERAC's resolution of Textileather's vinyl chloride argument could not validate a standard ERAC had already rejected on another ground.
 {¶ 77} The Ohio EPA, however, argues that ERAC only rejected some, and not all, of the cleanup standards. If ERAC declared the vinyl chloride cleanup standard lawful in its first conclusion of law, then its subsequent conclusion of law would be consistent with *Page 31 
the first. The Ohio EPA's argument is unavailing. After reviewing ERAC's opinion, we conclude that it found all of the cleanup standards to be unreasonable and unlawful. Accordingly, we sustain Textileather's third assignment of error.
 {¶ 78} For the foregoing reasons, we overrule the Ohio EPA's first, second, third, and fourth assignments of error. Further, we overrule Textileather's first and second assignments of error, but sustain its third assignment of error. Consequently, we affirm in part and reverse in part the final order of the Environmental Review Appeals Commission, and we remand this matter to the Ohio EPA for further action consistent with this opinion and the opinion of the Environmental Review Appeals Commission.
PETREE, J., concurs. WHITESIDE, J., dissent in part and concurs in part.
WHITESIDE, J., retired, of the Tenth Appellate District, assigned to active duty under authority of Section 6(C), Article IV, Ohio Constitution.
[1] The US EPA authorizes states to operate their own RCRA hazardous waste programs when those programs are at least equal to and consistent with federal standards.
[2] These areas are all adjacent to each other and encompass 0.145 acres in total.
[3] MEK, DMF, and THF are all solvents.
[4] In order to analyze if a risk-based cleanup is feasible, the owner or operator of the facility must first determine the rate and extent of contamination.
[5] BTEX is an abbreviation for four VOCs: benzene, toluene, ethyl benzene, and xylene.
[6] MW-14 is located immediately north of the USTs.
[7] Tangentially, we note that the Ohio EPA approved the Amended Closure Plan because it met "the performance standard contained in OAC rule 3745-66-11 and complie[d] with the pertinent parts of OAC rules 3745-66-12 and 3745-66-18." Thus, the Ohio EPA judged and approved the Amended Closure Plan under the interim standards. The Ohio EPA reversed its position on the applicability of the interim standards during Textileather's appeal before ERAC.
[8] As ERAC did, we apply the Ohio Administrative Code sections in effect at the time the Director issued the ACPA. Since that date, some of the cited provisions have been amended or renumbered.
[9] Ohio Adm. Code 3745-54-03 is consistent with Ohio Adm. Code3745-65-01(B)(1), which states that the interim standards apply to "[o]wners and operators of facilities that treat, store, or dispose of hazardous waste * * * until final administrative disposition of their permit application is made pursuant to the Part B permit requirements."
[10] In concluding that the CPRG is not a "rule" as that term is defined in R.C. 119.01(C) we do not imply that the CPRG is an "internal management rule." As demonstrated by State ex re. Saunders, supra, a guidance document does not have to be an "internal management rule" in order to avoid being categorized as a "rule."
[11] As we stated above, Killeen is the Ohio EPA employee overseeing Textileather's closure.
[12] Unlike THF, MEK, and DMF, phthalates are not solvents. Rather, they are plasticizers that Textileather uses in the manufacturing process to soften the vinyl. Before Textileather shut down the RCRA units, it stored 55-gallon drums containing discarded phthalates, along with other wastes, at the drum storage area.